**William L. Schmidt – SBN 206870**
Email: legal.schmidt@gmail.com
**Jeffrey W. Eisinger – SBN 109299**
Email: legal.schmidt.jeff@gmail.com
**WILLIAM L. SCHMIDT, ATTORNEY AT LAW, P.C.**
Post Office Box 25001
Fresno, CA 93729
559. 261.2222 Voice
559. 436.8163 Fax

Attorney for Plaintiffs DIONNE ESPINOZA and JAIME RUIZ,
individually and in their representative capacities.

## UNITED STATES DISTRICT COURT

## CNETRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| DIONNE ESPINOZA, individually and as successor-in-interest to KRYS BRANDON RUIZ, deceased; JAIME RUIZ, individually and as successor-in-interest to KRYS BRANDON RUIZ, deceased, <br><br> Plaintiffs, <br><br> *vs.* <br><br> CITY OF LOMPOC, a governmental entity; ANDREW S. WHITE, individually; MAURICIO T. CALDERON, individually; JULIO C. CARRILLO-BUENO, individually, and DOES 1 through 10, inclusive, <br><br> Defendants, | Case No. 2:21-cv-08563-TJH-AGR <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMMENDED COMPLAINT** <br> (Fed. R. Civ. Proc., rule 12(b)(6).) <br><br> **Date:** May 2, 2022 <br> **Time:** TBD <br> **Crtrm:** 9B [First Street U.S. Court] <br><br> Complaint filed: October 29, 2021 <br><br> [Hon. Terry J. Hatter, Jr.] |

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ............................................................ ii

    I.      PRELIMINARY STATEMENT. .................................. 1

    II.     SUMMARY OF ARGUMENT ..................................... 1

    III.    APPLICABLE FACTS ................................................ 3

    IV.   GOVERNING LEGAL STANDARDS ........................ 8

A.  Rule 12(b)(6) ........................................................................ 8

B.  Fourth Amendment Seizures/Detentions/Submission to Authority   10

    V.     ARGUMENT

                12

A.  Krys Ruiz submitted to the officers' commands to   12
    "show your hands," at which point in time he was "detained,"
    or "seized."

B.  Defendants lacked "reasonable suspicion" to detain Krys Ruiz,   14
    which was adequately pleaded in the FAC.

    VI.    CONCLUSION ........................................................... 19

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

**Page**

4  *Amili v. City of Tukwila*, 31 F.Supp.3d 1274 (W.D.Wash.2014)……………  6

5  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ………….…………………………… …12, 13

6  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)…………….……………  12, 13

7  *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400 (2007)…………………passim

8  *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547 (1991)………………passim

9  *Dees v. County of San Diego*, 960 F.3d 1145 (9th Cir. 2020)………………  …..   11

10  *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382(1991)…………………………  15

11  *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375 (2000),…………………………passim

12  *Florida v. Royer*, 460 U.S. 491 (1983)…………..…………....………………14, 15

13  *Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018)…………………………..   16

14  *Gilligan v. Jamco Develop. Corp.,* 108 F.3d 246 (9th Cir.1997)……………..……12

15  *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673 (2000)…………………..………14

16  *Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998)…………………   2

17  *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975 (1988)…………………..   14

18  *Navarette v. California*, 572 U.S. 393, 134 S.Ct. 1683 (2014)……………………  15

19  *Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th Cir.1998)…………………………..3, 4

20  *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480 (9th Cir.1995)……..…..4

21  *S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019)…………………..……    2

22  *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694 (1985)………………………    2

23  *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968)………………………………..passim

24  *Torres v. Madrid*, 141 S.Ct. 989 (2021)…………………………………………9

25  *U.S. v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744 (2002)…………………………..…14

26  *U.S. v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014)…………………………………  12

27  *U.S. v. Camacho*, 661 F.3d 718 (1st Cir. 2011)……………………………………  14

28  *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690 (1981)………..……………14

1

**CASES (Continued)**

2

<u>Page</u>

3  *United States v. Hearns*, 836 Fed.Appx. 520 (9th Cir. 2020)…………..……….…1

4  *U.S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870 (1980)………..………….13, 14

5  *U.S. v. Ritchie*, 342 F.3d 903 (9th Cir. 2003)………………………………..13

6  *United States v. Roberson*, 864 F.3d 1118 (10th Cir. 2017)…………..………..2

7  *U.S. v. Smith*, 794 F.3d 681 (7th Cir. 2015)…………………………………..8

8  *U.S. v. Thomas,* 863 F.2d 622 (9th Cir.1988)………………………………   1, 14

9  *U. S. v. Thompson,* 282 F.3d 673 (9th Cir.2002)……………………..……14

10  *U.S. v. Twilley*, 222 F.3d 1092. (2000)…………………………………..14

11  *United States v. Vandergroen*, 964 F.3d 876 (9th Cir. 2020)………………   7

12  *United States v. Williams*, 846 F.3d 303 (9th Cir. 2016)…………………….15

13  *Western Mining Council v. Watt,* 643 F.2d 618 (9th Cir.1981)………………12

14  *Wilson v. Town of Danville*, 2017 WL 2335545 (N.D.Cal., 2017)………………   1

15

**CONSTITUTIONS**

16

17

United States Constitution

18

Amendment IV………………………………………………passim

19

**STATUTES**

20

21

United States Code

22

Title 42 § 1983………………………………………………passim

23

**RULES**

24

25

Federal Rules of Civil Procedure

26

Rule 12(b)(6)………………………………………………passim

27

28

Plaintiffs' Memorandum of Points & Authorities ISO Opposition to Motion to Dismiss Complaint
*Espinoza. v. City of Lompoc,* Case No: 2:21-cv-08563-AB-AGR
iii

**Page**

Federal Rules of Evidence

     Rule 201……………………………………………………….…………….13

## **JURY INSTRUCTIONS**

Ninth Cir. Model Jury Instruction 9.7…………………………………………...13

1  Plaintiffs, by their undersigned counsel, submit the following Memorandum of
2  Points & Authorities in Support of their Opposition to the Motion by Defendants City of
3  Lompoc, *et al*., ("Defendants") to Dismiss the First Amended Complaint ("FAC") filed in
4  this action on March 18, 2022. **EFT#27**.

5  ## I.      PRELIMINARY STATEMENT.

6  As defendants' counsel correctly avers, "On March 30, 2022, [counsel for Plaintiff]
7  and I had a telephonic meet and confer conference regarding my offices' intention to file a
8  motion to dismiss. As part of that discussion, we were able to reach an agreement that the
9  *Monell* claims be dismissed without prejudice, but unable to resolve our differences
10  regarding the other cause of action." Declaration of Alison S. Flowers ISO Motion to
11  Dismiss, (**EFT#34-1**) filed 4/1/2022, at p. 2, ¶ 3; underlining added.

12  Ergo, the Court may enter an Order dismissing, without prejudice to Plaintiffs' right
13  to move the Court for leave to amend, Plaintiffs' Fifth and Eighth Claims (the "*Monell*
14  Claims") without further ado. See, e.g., *Wilson v. Town of Danville*, 2017 WL 2335545, at
15  *4 (N.D.Cal., 2017) [In granting defendants' motion under Rule 12(b)(6), district court
16  stated, "Defendants make the reasonable suggestion that the court should grant the motion
17  without prejudice to Plaintiff later seeking leave to add a *Monell* claim once Plaintiff has
18  conducted appropriate discovery."] Emphasis added.

19  Thus, the Court need only consider the efficacy of Plaintiffs' First Claim, i.e.,
20  "UNREASONABLE SEARCH AND SEIZURE – UNLAWFUL DETENTION AND
21  ARREST." Notably, none of the authority relied upon by Defendants in their Rule 12(b)(6)
22  motion---and none cited and discussed by Plaintiffs here---involved a motion to dismiss
23  under Rule 12(b)(6); they arose in the context of summary judgment, or on appeal from an
24  order on a motion to suppress evidence.

25  ## II.      SUMMARY OF ARGUMENT.

26  Succinctly put, "Fourth Amendment law recognizes three types of police-citizen
27  encounters: (1) consensual encounters; (2) investigative detentions; and (3) arrests. Both
28  detentions and arrests are seizures. Police must have reasonable suspicion of criminal

activity for a detention and probable cause that a crime has been committed for an arrest." *United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017)

Here, the questions are: **(1)** Was there a *detention* within the meaning of the Fourth Amendment, and, if there was a detention, **(2)** did the defendant Lompoc Police Officers have "reasonable suspicion" to detain Plaintiffs' decedent Krys Brandon Ruiz when they detained him? Presumably, defendants will concede that when, at the end of their encounter with Mr. Ruiz, they shot him to death he was, at that point, "seized." See, e.g., *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."); *Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998).

Plaintiffs assert that decedent was detained earlier on the continuum of his encounter with the defendant officers, and that when that initial detention occurred, those officers lacked the requisite "reasonable suspicion," which the Ninth Circuit defines as "…<u>a particularized and objective basis for suspecting the **particular person** stopped of criminal activity</u>." *U.S. v. Twilley*, 222 F.3d 1092, 1095. (2000) (Emphasis added.)

But defendants argue that there was no detention before Mr. Ruiz was shot because decedent was not physically restrained, nor did he submit to the officers' show of authority by obeying their commands. "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an <u>attempted seizure</u>, so far as the Fourth Amendment is concerned. See *California v. Hodari D.,* 499 U.S. 621, 626, n. 2, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)…" *Brendlin v. California*, 551 U.S. 249, 254–55, 127 S.Ct. 2400, 2405–06 (2007) Emphasis added.

In brief, and in the context of this case, if Krys Brandon Ruiz did not submit to the officers' show of authority, there was no detention, and if there was no detention, it is pointless to consider whether there was legally sufficient "reasonable suspicion" to effect a detention that never happened. On the other hand, if, as Plaintiffs assert, he did submit,

1   then he was detained, so the Court will need to determine if it resulted from the aforesaid

2   "reasonable suspicion."

### III.    APPLICABLE FACTS.

4       In the context of a Rule 12(b)(6) motion, a court's analysis is informed by the facts

5   *actually pleaded in the Complaint*, not as interpreted, parsed, supplied, augmented,

6   embellished or *summarized* by the moving party. *Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th

7   Cir.1998) ["We limit our review to the allegations of material facts set forth in the

8   complaint, which we read in the light most favorable to the non-moving party and which,

9   together with all reasonable inferences therefrom, we take to be true."].

10       The facts material for the subject Rule 12 motion as set forth in the FAC are at pp. 5

11   – 12, ¶¶ 24 – 44 (**ECF#27**, pp. 5 – 12 of 27.), excerpted as follows:

12       24.    At the time of the shooting incident giving rise to this lawsuit, DECEDENT

13   was a 26-year-old anatomical female, 5 feet in height, weighing 150 lbs., christened Yvette

14   Krystella Ruiz, who identified as male and had lawfully changed his name and gender

15   designation so that at the time of his demise he was Krys Brandon Ruiz, a male.

16       25.    On March 28, 2021, around 8:00 p.m., LPD received a 911 call from an

17   anonymous caller who reported that a person holding a gun was walking in the alleyway

18   between G and H streets near the old Lompoc Theater at 100 N. H Street, City of Lompoc.

19   The anonymous 911 caller described the person as wearing dark clothing and possibly a

20   mask.

21       26.    At 8:08:28 p.m., CARRILLO arrived in the alleyway between H Street and

22   G Street from Ocean Avenue and saw a person, later identified as DECEDENT, walking

23   up the alleyway towards Walnut Avenue. The alleyway runs parallel to North G Street and

24   North H Street, which, in that area, is part of U.S. Highway 1, known as the Cabrillo

25   Highway. That 19-foot-wide alleyway extends north from another unmarked, unnamed 25-

26   foot-wide alleyway running east-to-west 322 feet between H and G Streets, north of Ocean

27   Avenue. 152 feet east of its H Street entrance, that alleyway intersects with the one

28   running north to Walnut Avenue. The distance from that intersection of the alleyways and

terminating on Walnut Avenue is 360 feet. A person walking 2.7 mph covers 360 feet in 1 minute 18 seconds. The distance from H Street to the intersection of the two alleyways (152 feet) plus the 360 feet north to Walnut Avenue is 512 feet, and a person walking 2.7 mph covers that distance in 2 minutes 9 seconds. There were no occupied dwellings, or open business establishments abutting either of those alleyways between 8 p.m. and 8:30 p.m. on March 28, 2021, but there were an open liquor store and an open marijuana dispensary across H Street from the Walnut Avenue terminus of the north-south alleyway.

27.   As CARRILLO approached from behind, the DECEDENT was walking with an ambling gait away from, with his back to, the police cruiser, which slowly followed DECEDENT. The DECEDENT was wearing a dark-colored hooded sweatshirt, with the hood covering the back, top and sides of the person's head, and both DECEDENT'S hands were in his pockets.

28.   CARRILLO gave repeated verbal commands for DECEDENT to stop and to show his hands. DECEDENT did not stop, nor did he show his hands, but CARRILLO is unable to say whether DECEDENT heard the commands and chose to ignore them, as DECEDENT made no verbal response to CARRILLO'S commands, or otherwise indicated DECEDENT had heard said commands, but if, indeed, DECEDENT heard CARRILLO, those commands, which impeded DECEDENT'S forward movement along the alleyway amounted to an attempted *detention* without probable cause or reasonable suspicion. At no time did CARRILLO see a gun on the person, in the hands, or vicinity of DECEDENT.

29.   DECEDENT, unable to continue his way along the alleyway due to the officers' positioning and show of authority, then moved into some tall bushes on the vacant lot bordering the alley, and CARRILLO lost sight of him.

30.   CALDERON and WHITE approached the alleyway from Walnut Avenue, which is the portion of the vacant lot that has shrubbery, plants, and trees. The vacant lot and the alleyway were unilluminated except for the headlights/spotlights of the police cruisers and the officers' flashlights. CALDERON purposely positioned himself near the

building and his cruiser for cover because he knew that the 911 caller indicated that the subject had a gun. CALDERON was armed with his LPD-issued AR-15 and could see DECEDENT moving through the bushes. CALDERON commanded DECEDENT to stop and to show his hands. DECDEDENT stood up and raised his left hand above his head but did not say anything.  CALDERON'S action of approaching DECEDENT with an assault rifle and his commands to DECEDENT, who was corralled by the positioning of the officers, constituted an unlawful *detention* without probable cause or reasonable suspicion.

32.     WHITE also approached the alleyway from the Walnut Avenue end and used his cruiser's spotlight to illuminate the shrubbery portion of the vacant lot. WHITE shouted "Lompoc Police, show us your hands, show us your hands." WHITE'S use of the cruiser spotlight and his verbal commands further escalated an unlawful *detention* without probable cause or reasonable suspicion. DECEDENT did not respond, but did briefly raise his arms in the air, while still in the bushes. When DECEDENT'S arms were in the air, WHITE could see the DECEDENT'S hands because his sleeves were loosely gathered at the wrists and fell downward when he raised his arms. WHITE did not ever see a gun on the person, in the hands, or vicinity of DECEDENT.

33.     DECEDENT them put his arms down and began pacing around in the bushes before emerging from the bushes and quickly moving in the direction of CALDERON. WHITE saw DECEDENT moving his hands in a windmill fashion, but WHITE did not see any gun or other weapon in DECEDENT'S hands. WHITE began to re-holster his pistol, but as he did so DECEDENT got closer, and WHITE says he saw light reflect off a large blade in DECEDENT'S right hand. WHITE drew his pistol again and when he heard CALDERON shooting, WHITE also started shooting---four times--- until DECEDENT fell.

34.     At all times relevant, no bystander was in the immediate vicinity and none of the Defendant-officers were hemmed in, or unable, or incapable of quickly moving in one of several directions away from the approaching DECEDENT, who was shot while he was at least 20 – 25 feet away from the nearest officer, and who was not armed with a firearm.

36.     After being shot with multiple rounds from a lethal firearm, DECEDENT was immobile, bleeding profusely, and in obvious and critical need of emergency medical care and treatment. Defendants CALDERON, WHITE, CARRILLO and DOES 1-5 did not timely summon medical care or permit medical personnel to treat DECEDENT. The delay of medical care to DECEDENT caused DECEDENT extreme physical and emotional pain and suffering and was a contributing cause of DECEDENT's death.

37.     At all relevant times, DECEDENT was not the subject of any arrest, or search warrant, nor was there any probable cause, or even <u>reasonable</u> suspicion to believe that he was engaged in criminal activity. DECEDENT was merely walking down an alleyway in an unthreatening, lawful manner. His detention by WHITE, CALDERON and CARRILLO was not justified under all clearly established, long-standing Fourth Amendment jurisprudence, and was, therefore, unlawful.

38.     At all relevant times, including during the fusillade of police gunfire, DECEDENT was not armed with a firearm and was never proximate enough to any other person, including law enforcement, to constitute an imminent, or immediate threat to the safety of anyone other than himself. Therefore, the shooting was excessive and unreasonable, as most certainly was the shooting by WHITE, who was simply mimicking, and reacting to, the behavior of CALDERON, who initiated the gunfire.

43.     The Fourth Amendment of the United States Constitution guarantees all persons the right to be free from unreasonable detention in violation of their right to privacy. 42 U.S.C. § 1983 provides a private right of action for conduct which violates this right. A "detention" occurs when law enforcement, by show of authority, deter a person from going about his business. <u>See</u>, e.g., *U.S. v. Smith*, 794 F.3d 681, 685 (7th Cir. 2015) ["…encounter in a dark alley, the threatening presence of multiple officers, the aggressive nature of the questioning, and the fact that Smith's freedom of movement was physically obstructed by the positioning of the officers…we conclude that a reasonable person in Smith's situation would not have felt at liberty to ignore the police presence and go about his business."] <u>See</u>, also, *Amili v. City of Tukwila*, 31 F.Supp.3d 1274, 1278 (W.D.Wash.,

1    2014) [defendants "…were effectively seized when they stopped at [officer's] command

2    while having a taser pointed at them."]

3           44.     WHITE, CALDERON and CARRILLO violated DECEDENT's right to be

4    free from unreasonable search and seizures, which is guaranteed to him by the Fourth

5    Amendment to the United States Constitution and applied to state actors by the Fourteenth

6    Amendment. This was not a "consensual encounter," where "…[t]he person approached,

7    however, need not answer any question put to him; indeed, he may decline to listen to the

8    questions at all and may go on his way.  [Citation.]  He may not be detained even

9    momentarily without reasonable, objective grounds for doing so; and his refusal to listen or

10   answer does not, without more, furnish those grounds.  [Citation.]." *Florida v. Royer*, 460

11   U.S. 491, 497-498 (1983). Instead, commands were shouted, spotlights and flashlights

12   were shone on him, guns were drawn and pointed at him, and DECEDENT was corralled

13   into the vacant lot adjoining the alleyway.

14          45.     The detention of DECEDENT by WHITE, CALDERON and CARRILLO

15   was not justified under the Fourth Amendment because it was effected without probable

16   cause, or reasonable suspicion, as those predicates have been clearly defined and

17   established by long-settled Supreme Court jurisprudence. The anonymous 911 caller did

18   not convey information suggesting that the person-in-dark-clothing-carrying-a-gun was an

19   emergency situation, or that said person had brandished the gun in a threatening way, or by

20   words or conduct had threatened the anonymous caller. The Court in *Florida v. J.L.,* 529

21   U.S. 266, 268, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), dealt with an anonymous caller

22   who told the police "that a young black male standing at a particular bus stop and wearing

23   a plaid shirt was carrying a gun." Police proceeded to the bus stop, frisked J.L.—who was

24   black and was wearing a plaid shirt—and seized a gun from his pocket. *See id.* The Court

25   held this tip insufficient to justify the investigatory stop. *See id.* at 274, 120 S.Ct. 1375. It

26   "lacked the moderate indicia of reliability present in *White* and essential to the Court's

27   decision in that case" because "[t]he anonymous call concerning J.L. provided no

28   predictive information and therefore left the police without means to test the informant's

knowledge or credibility." *Id.* at 270–71, 120 S.Ct. 1375. The Court explained that the tip leading to J.L.'s arrest was "[a]n accurate description of a subject's readily observable location and appearance" but "d[id] not show that the tipster ha[d] knowledge of concealed criminal activity.... [R]easonable suspicion ... requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272, 120 S.Ct. 1375. The Court also declined to speculate about situations in which "the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability," such as "a report of a person carrying a bomb." *Id.* at 273, 120 S.Ct. 1375. See, e.g., *United States v. Vandergroen*, 964 F.3d 876, 878 (9th Cir. 2020) [911 caller provided his name, location, and occupation in reporting 3 patrons' accounts of man "Latin," "wearing a blue sweater with a Warriors ... logo," "skinny," and in his early 20s, carrying concealed handgun; 911 caller was observing suspect while talking on phone with 911 operator and with patrons standing nearby and answering 911 operator questions; 911 caller provided color, make of car being driven by suspect and his direction of travel]

46.    …WHITE, CALDERON and CARRILLO acted under color of state law. Those officers had no reasonable suspicion to detain DECEDENT and no probable cause to arrest him because the anonymous 911 call did not even provide sufficient descriptive information about the person in the alley, e.g., height, weight, gender, ethnicity, age, etc. Further, it was not reasonable to believe that the person seen walking in a 360, or even 512-foot-long alleyway would still be there 8 minutes later, particularly when there were no proximate residences, or places of business to linger at. In addition to the detention itself being unreasonable, the scope and manner of the detention was unreasonable. It was not necessary to use deadly force against DECEDENT in order to lawfully detain him, e.g., Defendants could have sent a police dog into the shrubbery to roust him out, but they indisputably seized DECEDENT the instant their bullets struck his body. *Torres v. Madrid*, 141 S.Ct. 989, 999 (2021).

## IV.    GOVERNING LEGAL STANDARDS.

### A.    Rule 12(b)(6).

The defendants move the Court to dismiss Plaintiff's complaint for failure to state a claim. The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted. See *Gilligan v. Jamco Develop. Corp.,* 108 F.3d 246, 249 (9th Cir.1997). The Court must construe the FAC in the light most favorable to the plaintiff. See *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See *Id.*

However, although courts assume the facts alleged are true, courts do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981), *cert. denied,* 454 U.S. 1031 (1981). The pleading must be read in the light most favorable to the nonmoving party. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Rule 12(b) provides that, if a party presents matters outside the pleadings along with its motion to dismiss for failure to state a claim, then the motion shall be considered under Rule 56. See Fed.R.Civ.P. 12(b). As a general proposition, **"**A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Plaintiffs cite this authority because at this stage of the litigation, when no Rule 26 disclosures have been served, no discovery propounded and answered, and much of the

salient evidence is exclusively in the custody and control of defendants, it is significant that defendants have not, at the very least, sought judicial notice under Federal Rule of Evidence 201 of official City of Lompoc maps depicting the site of the shooting death alleged in the Complaint so as to inform the Court's analysis, e.g., the length of the alleyway from one end to the other and the scarcity of adjacent occupied commercial, or residential structures in calculating the likelihood the armed pedestrian reported by the anonymous tipster at 8:00 p.m. would still be in the vicinity 8 minutes later. (FAC, ¶¶ 25, 26, 46; pp. 3 -4, 8 *ante*.)

### B. <u>Fourth Amendment Seizures/ Detensions/Submission to Authority</u>

<u>A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.</u> See *California v. Hodari D.,* 499 U.S. 621, 626, n. 2, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Lewis, supra,* at 844, 845, n. 7, 118 S.Ct. 1708.

When the actions of the police do not show an unambiguous intent to restrain <u>or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *id*.,</u> at 554, 100 S.Ct. 1870 (principal opinion). Later on, the Court adopted Justice Stewart's touchstone, see, *e.g.*, *Hodari D.*, *supra*, at 627, 111 S.Ct. 1547; *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), <u>but added that when a person "has no desire to leave" for reasons unrelated to the police presence, the "coercive effect of the encounter" can be measured better by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter,"</u> *Bostick, supra,* at 435–436, 111 S.Ct. 2382; see also *United States v. Drayton,* 536 U.S. 194, 202, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002).

*Brendlin v. California*, *supra*, 551 U.S. 249, 254–55; emphasis added.

---

1    When submission to police authority is disputed, a court must also ascertain whether and

2    when the subject of the seizure actually acquiesced to that authority. *Hodari D.,* 499 U.S.

3    at 628–29, 111 S.Ct. 1547; *Brendlin,* 551 U.S. at 254, 127 S.Ct. 2400. <u>See</u>, also, *Dees v.*

4    *County of San Diego*, 960 F.3d 1145, 1154 (9th Cir. 2020) ["Whether a person is seized for

5    purposes of the Fourth Amendment is a mixed question of law and fact. *United States v.*

6    *Cormier*, 220 F.3d 1103, 1110 (9th Cir. 2000)."]

7        "An investigatory stop must be justified by some objective manifestation **that the**

8    **person stopped** is, or is about to be, engaged in criminal activity." *United States v.*

9    *Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690 (1981); <u>see</u> also *Terry v. Ohio,* 392 U.S. 1, 21,

10   88 S.Ct. 1868 (1968) (recognizing government interest in "approach[ing] a person for

11   purposes of investigating possibly <u>criminal behavior</u>").

12        Courts must consider the "totality of the circumstances" to determine whether the

13   police officer had "a particularized and objective basis for suspecting legal wrongdoing."

14   <u>See</u> *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)

15   (internal quotation marks omitted); *United States v. Thompson,* 282 F.3d 673, 678 (9th

16   Cir.2002) ("[S]pecific, articulable facts ... together with objective and reasonable

17   inferences, [must] form the basis for suspecting **that the particular person detained is**

18   **engaged in criminal activity**." (internal quotation marks omitted)).

19        As noted earlier, the requisite "reasonable suspicion" that the person being

20   approached is involved in criminal activity <u>must exist at the moment the police officer</u>

21   <u>initiates the investigatory stop.</u> *United States v. Thomas, supra*, 863 F.2d 622, 625. Further,

22   "[t]he officer must be able to articulate more than an 'inchoate and unparticularized

23   suspicion or "hunch"' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24,

24   120 S.Ct. 673, 676 (2000), (citing *Terry*, supra, at 392 U.S. 27.)

25        The Supreme Court held in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75

26   L.Ed.2d 229 (1983), that where an officer, without reasonable suspicion or probable cause,

27   approaches an individual, the individual has a right to ignore the police and go about his

28   business. *Id.,* at 498, 103 S.Ct. 1319. And later, the Court further held that any "refusal to

cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

## V.   ARGUMENT.

**A.  Krys Ruiz submitted to the officers' commands to "show your hands," at which point in time he was "detained," or "seized."**

As pleaded in ¶¶ 30, 32 and 33 of the FAC---excerpted *ante* at pp. 4 – 5---decedent was corralled into the bushes by the positioning of the officers' cruisers, where, in response to their repeated commands to "show your hands," <u>he stood up, raised his arms and showed his hands.</u>

Those actions constitute "submission to authority." Thus, "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, <u>but one sitting in a chair may submit to authority by not getting up to run away."</u> *Brendlin,* 551 U.S. at 262, 127 S.Ct. 2400; *see also* LaFave, 4 *Search & Seizure* § 9.4(d) (observing that "lower courts will frequently be confronted with difficult questions concerning precisely when the requisite physical seizure or submission to authority ... occurs").

In an analogous case, the District of Columbia Circuit considered whether a man told by the police to place his hands on the hood of a police car, briefly did so, but then ran away, had been detained. The Court reasoned that

> We can see no basis for classifying Brodie's action—putting his hands on the car when told to do so by the police—as anything other than full compliance with the officer's request. Nothing suggests, for example, that the compliance was feigned. Cf. *United States v. Garcia,* 516 F.2d 318, 320 (9th Cir.1975). In fact, the district court found that "Mr. Brodie put his hands on the car *and then* decided that he was going to run." Motions Hearing Tr. 75, July 26, 2010 (emphasis added). Nor does anything in the record suggest that Brodie had some ulterior purpose in putting his hands on the car, such as a belief that doing so would facilitate escape. <u>Contrary to the government's position, the short duration of Brodie's submission means only that the seizure was brief, not that no seizure occurred. Later acts of noncompliance do not negate</u>

<u>a defendant's initial submission, so long as it was authentic.</u> See *United States v. Brown,* 401 F.3d 588, 595 (4th Cir.2005); see also *United States v. Brown,* 448 F.3d 239, 246 (3d Cir.2006).

*U.S. v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014); emphasis added.

Similarly, the First Circuit considered a case where the officers pulled their police cruiser in front of the defendant, who was afoot, intentionally blocking his path, as had been done here by Carrillo, Calderon and White, which forced decedent into the bushes, where he did not attempt to flee, and did later stand and show his hands.

The Court said:

> …we conclude that Camacho's initial detention constituted a seizure rather than a consensual encounter. This is not a case in which the officers "merely approach[ed] an individual on the street ... by asking him if he [was] willing to answer some questions." See *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see also Young,* 105 F.3d at 5–6 (finding only a "minimally intrusive" interaction that "d[id] not trigger the protections of the Fourth Amendment" when the police officers had pulled alongside the appellant, identified themselves as police officers, and asked "Got a minute?", to which the appellant replied, "Sure"). <u>Rather, Officers Sousa and Conceicao intentionally blocked Camacho's path with their Crown Victoria; both officers were wearing jackets labeled "New Bedford Police" and "Gang Unit"; Officer Sousa stepped out of the car and confronted Camacho with "accusatory" questions; and Officer Conceicao ordered Osario–Meléndez to place his hands on the hood of the car. Under the totality of these circumstances, we agree with the district court that a reasonable person in Camacho's circumstances would not "feel free 'to disregard the police and go about his business.' "</u> See *Bostick,* 501 U.S. at 434, 111 S.Ct. 2382 (quoting \*726 *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)); *cf. also Gentry v. Sevier,* 597 F.3d 838, 845 (7th Cir.2010) (<u>"A reasonable person in [the appellant's] position, who saw a marked police car pull up and who was told by a police officer to keep his hands up, would not believe that he was free to leave."</u>). And Camacho submitted to Officer Sousa's show of authority by responding to his questions, at which point "his liberty ha[d] been restrained and he [was] seized under the Fourth Amendment." *United States v. Dubose,* 579 F.3d 117, 121 (1st Cir.2009) (citing *United States v. Sealey,* 30 F.3d 7, 9 (1st Cir.1994)); *see Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547 (holding that when a seizure is based upon an officer's

> show of authority, no seizure occurs until the suspect yields to that authority and is thereby restrained in his liberty). Therefore, we conclude that Officer Sousa's initial questioning of Camacho constituted a seizure for purposes of the Fourth Amendment.

*U.S. v. Camacho*, 661 F.3d 718, 725–26 (1st Cir. 2011); underlining added.

As noted in the FAC (¶ 43) and at p. 7 *ante*, another district court in the Ninth Circuit ruled that the two defendants "…were effectively seized when they stopped at [officer's] command while having a taser pointed at them." *Amili v. City of Tukwila*, 31 F.Supp.3d 1274, 1278 (W.D.Wash., 2014) Here, Krys Ruiz stood up, raised his arms and showed his hands while having headlights, flashlights, and assault rifle and some handguns pointed at him.

Ruiz was not fleeing; he was staying put in the bushes, akin to sitting in a chair showing the "passive" submission as discussed by the *Brendlin* Court, *supra*, 551 U.S. at 262, 127 S.Ct. 2400, but also showing *active* submission by showing his hands, even if he did not comply with other commands made by the officers. See, e.g., *Michigan v. Chesternut,* 486 U.S. 567, 575–6, 108 S.Ct. 1975 (1988) (listing examples of police behavior that "communicate[ ] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement," including "activat[ing] a siren or flashers," "command[ing a person] to halt," or "operat[ing] the [police] car in an aggressive manner to block [a person]'s course").

If an individual does submit to a show of police authority, and police then discover evidence, the court must assess whether either reasonable suspicion or probable cause supported the seizure. See *Terry,* 392 U.S. at 20–21, 88 S.Ct. 1868.

**B.  Defendants lacked "reasonable suspicion" to detain Krys Ruiz, which was adequately pleaded in the FAC.**

Plaintiffs do not intend to belabor the point, merely to emphasize it: "The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has "a particularized and objective basis for suspecting the

**particular person** stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396, 134 S.Ct. 1683, 1687 (2014).

Here, Defendants argue that the 911 caller here satisfies the "indicia of reliability" required in cases where law enforcement is acting on an anonymous tip to effect a detention. Motion, pp. 11 – 12. Unaccountably, though, Defendants do not apprise the Court of ALL the factors that must be considered in determining whether the 911 tip is reliable. They understate, if not misstate, the governing law by averring, "Here, the anonymous 911 caller provided an accurate, if not overly detailed, description of Decedent in the precise location he was found, engaging in possible criminal activity—brandishing a firearm." MPA ISO Rule 12 Motion, at 11:20.

In fact, in every single case Defendants cite as support for their position, the 911 caller provided what must be viewed as a very overly detailed description of the subjection, in comparison to that given here, as set forth in ¶25 of the FAC, *viz*: "On March 28, 2021, around 8:00 p.m., LPD received a 911 call from an anonymous caller who reported that a person holding a gun was walking in the alleyway between G and H streets near the old Lompoc Theater at 100 N. H Street, City of Lompoc. The anonymous 911 caller described the person as wearing dark clothing and possibly a mask."

Compare that 911 caller's description of the suspect to what was provided in the cases cited by Defendants:

- "At 4:40 a.m., a person who identified himself as Tony Jones telephoned a Las Vegas police hotline to report an adult, black male sleeping inside a grey Ford Five Hundred car." *United States v. Williams*, 846 F.3d 303, 307 (9th Cir. 2016) Underlining added.

- "On July 4, 2013, at around 1:30 p.m., the City of Indio Police Department received an anonymous 911 call reporting an individual carrying a gun. The caller stated that a man "with a brown hat, aqua shirt, a blue aqua shirt, [and] black, blue jeans" was "walking down Highway 111 toward subways and smoke shops with a handgun, with a ... gun in his right side pocket." The

caller also described the man as a "55-year-old African-American gentleman weighing about 250 pounds with a handgun in his right side pocket" and a "baby brown or beige ball cap." The caller further stated that the man did not point the gun at him, but "walked out of the liquor store" and "just opened the gun." The caller further stated that the man "was no stress to me, but ... he wants to let people know who he is." *Foster v. City of Indio*, 908 F.3d 1204, 1207 (9th Cir. 2018) Underlining added.

As Plaintiffs alleged in the FAC, "The Defendant-officers did not know if that person walking down the alley was male, or female, African-American, Mexican-American, or Anglo-American. The Defendant-officers did not know if that person walking down the alley was the same person the anonymous 911 caller had reported to dispatch 4 or 5 minutes earlier." FAC, ¶49.

Similarly, and another stark contrast to what the officers in this case knew when they purported to contact Kry Ruiz, the Ninth Circuit more recently discussed the reliability of a 911 caller's tip in *United States v. Vandergroen*, 964 F.3d 876, 878 (9th Cir. 2020), where the 911 caller provided his name, location, and occupation in reporting 3 patrons' accounts of man "Latin," "wearing a blue sweater with a Warriors ... logo," "skinny," and in his early 20s, carrying concealed handgun; 911 caller was observing suspect while talking on phone with 911 operator and with patrons standing nearby and answering 911 operator questions; 911 caller provided color, make of car being driven by suspect and his direction of travel

In sum, how could the officers articulate with particularity the facts that would cause them to believe that the **particular** person they were attempting to contact was involved in criminal activity, as demanded in Fourth Amendment jurisprudence, e.g., *United States v. Thompson,* 282 F.3d 673, 678 (9th Cir.2002) ("[S]pecific, articulable facts ... together with objective and reasonable inferences, [must] form the basis for suspecting **that the particular person detained is engaged in criminal activity**." (internal quotation

marks omitted)). See, also, *Twilley*, *supra*, at 222 F.3d 1092, 1095.

The 911 caller did NOT say if the person walking down the alleyway was short, or tall, male or female, Hispanic, Black, or Asian, young or old, fat or skinny. Moreover, and as alleged in the FAC at ¶26:

> That 19-foot-wide alleyway extends north from another unmarked, unnamed 25-foot-wide alleyway running east-to-west 322 feet between H and G Streets, north of Ocean Avenue. 152 feet east of its H Street entrance, that alleyway intersects with the one running north to Walnut Avenue. <u>The distance from that intersection of the alleyways and terminating on Walnut Avenue is 360 feet. A person walking 2.7 mph covers 360 feet in 1 minute 18 seconds. The distance from H Street to the intersection of the two alleyways (152 feet) plus the 360 feet north to Walnut Avenue is 512 feet, and a person walking 2.7 mph covers that distance in 2 minutes 9 seconds. There were no occupied dwellings, or open business establishments abutting either of those alleyways between 8 p.m. and 8:30 p.m. on March 28, 2021, but there were an open liquor store and an open marijuana dispensary across H Street from the Walnut Avenue terminus of the north-south alleyway</u>

Underlining added.

These measurements and description of the area are provided to distinguish the scene here from what one familiar with a large metropolitan city like Los Angeles might imagine when he or she considers the term "alley," or "alleyway." Plaintiffs' point was to call into question the reasonableness of expecting that a person brandishing a firearm as he walked down a relatively short, open and exposed "alleyway" would still be walking down that same alleyway 8 minutes later, when the police arrived, when in just a little over 2 minutes that gun-wielding pedestrian could have leisurely walked the entire length of said alley. Besides, there were no nearby businesses, or residences to capture the attention of the person walking down the alley. See, FAC ¶46.

The Court in *Florida v. J.L.,* 529 U.S. 266, 268, 120 S.Ct. 1375 (2000), cited and discussed in ¶45 of the FAC Court, explained that the tip leading to J.L.'s arrest was <u>"[a]n accurate description of a subject's readily observable location and appearance"</u> but "d[id] not show that the tipster ha[d] knowledge of concealed criminal activity.... [R]easonable

suspicion ... requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272, 120 S.Ct. 1375.

Here, by contrast, and as in the other cases cited by Defendants, the 911 caller's description was not even close to being an "accurate description" of Krys Brandon Ruiz, and the mention of a "possible mask" did not become material until AFTER decedent had been detained, when Calderon claims he saw decedent stand up in the bushes. As the Ninth Circuit recently held:

> Hearns argues that the physical evidence should have been suppressed because the anonymous 911 call did not provide the arresting officers with reasonable suspicion. Whether a police officer possesses a reasonable suspicion to initiate a *Terry* stop[1] depends "upon both the content of the information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 396–97, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quoting *522 *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). Where an officer relies on an anonymous tip in making a stop, the tip must demonstrate "sufficient indicia of reliability" to support a reasonable suspicion. *Id.* at 397, 134 S.Ct. 1683 (quoting *White*, 496 U.S. at 327, 110 S.Ct. 2412). <u>The 911 call here demonstrated "sufficient indicia of reliability" because it:</u> (1) was based on eyewitness knowledge; (2) was made contemporaneously with the incident given the caller's real-time description of Hearns' location; (3) was made using a 911 emergency system capable of recording and tracing the call; (4) described ongoing and dangerous conduct; and **(5) provided detailed information regarding Hearns' description and location which was corroborated by the officers' observations.** *See id.* at 399–402, 134 S.Ct. 1683; *Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Therefore, the 911 call provided the officers with reasonable suspicion to detain Hearns.

*United States v. Hearns*, 836 Fed.Appx. 520, 521–22 (9th Cir. 2020)

Unless an accurate and at least sufficiently detailed physical description of the alleged culprit may be dispensed with in a Fourth Amendment analysis, the call in this case did NOT demonstrate a "sufficient indicia of reliability," and, in any case, did not provide the officers with sufficient information to form a legally-cognizable "reasonable suspicion" that the **<u>particular person</u>** they were seeking to stop was engaged in criminal activity.

1

**VI.    CONCLUSION**

2        Krys Ruiz was seized within the meaning of the Fourth Amendment, but that

3   detention was effected without the quantum and quality of reasonable suspicion required.

4        As for the *Monell* Claims, and as earlier confirmed, they may be dismissed *without*

5   *prejudice.* For the foregoing reasons, Plaintiffs respectfully request the Court to deny

6   Defendants' Motion to Dismiss Plaintiffs' First Claim as alleged in the First Amended

7   Complaint. Alternatively, should the Court grant said motion, Plaintiffs seek an

8   opportunity to amend Complaint.

9   Dated: April 11, 2022.

10                                      Respectfully submitted,

11

12                          /s/   William L. Schmidt
                                      William L. Schmidt
13                                    Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28